NAVAJO NATION, Plaintiff–Appellant,

v.

DEPARTMENT OF HEALTH &
HUMAN SERVICES, Secretary,
Defendant–Appellee.

No. 99–16129.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 2, 2001.

Panel Opinion Filed April 8, 2002.

Rehearing En Banc Granted Oct. 2, 2002.

Argued and Submitted En
Banc Dec. 9, 2002.

Filed April 8, 2003.

Thomas W. Christie, Navajo Nation Department of Justice, Window Rock, Navajo Nation, AZ, for the plaintiff-appellant.

Barbara C. Biddle, John S. Koppel, Department of Justice, Civil Division, Washington, D.C., for the defendant-appellee.

Before SCHROEDER, Chief Judge, B. FLETCHER, TROTT, RYMER, THOMAS, GRABER, McKEOWN, McLANE WARDLAW, GOULD, BERZON, and CLIFTON, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge.

This appeal focuses on the interplay between two federal statutes: Temporary Assistance for Needy Families ("TANF") and the Indian Self–Determination and Education Assistance Act ("ISDEAA"). The specific question we address is whether an Indian tribe may administer TANF, a welfare grant program, through a self-determination contract under the ISDEAA. Like the district court, we conclude that TANF does not qualify as a contractable program under the ISDEAA.

### BACKGROUND

Until recently, the federal government played a dominant role in administering welfare. Although states made many determinations about their own programs, welfare oversight and funding were centralized in the hands of the federal government from the mid–1930s to the late 1970s.[1] During the 1980s, however, the federal government began to decrease its direct involvement in welfare, simultaneously granting states more latitude in their programs and reducing both eligibility for and the scope of benefits.[2]

The federal government initiated its most dramatic break with the past—"ending welfare as we know it"[3]—when Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). 104 Pub.L. 193, 110 Stat. 2105. PRWORA signaled a major shift in welfare law and policy, jettisoning the old Aid to Families with Dependent Children ("AFDC") program in favor of TANF. 42 U.S.C. §§ 601 et seq. TANF

---

1. See Michelle L. VanWiggeren, *Experimenting With Block Grants and Temporary Assistance: The Attempt to Transform Welfare by Altering Federal–State Relations and Recipients' Due Process Rights,* 46 Emory L.J. 1327, 1331 (1997).

2. *Id.* at 1334–35.

3. See Francis X. Clines, *Clinton Signs Bill Cutting Welfare; States in New Role,* N.Y. TIMES, Aug. 23, 1996, at A1 (quoting President William J. Clinton).

was intended "to increase the flexibility of States" in operating welfare programs by shifting administration of welfare benefits almost entirely from the federal government to the states. 42 U.S.C. § 601(a). TANF explicitly provides that it "shall not be interpreted to entitle any individual or family to assistance." 42 U.S.C. § 601(b). In order to receive funds under TANF, states must submit a plan and apply for block grants. 42 U.S.C. §§ 602–603. In other words, TANF is simply a pass-through program that funnels federal money to states for state-run welfare programs.

TANF also authorizes Indian tribes to apply for welfare funds. 42 U.S.C. § 612. TANF's provision for "direct funding and administration by Indian tribes" directs the Secretary of Health and Human Services ("HHS") to "pay to each Indian tribe that has an approved tribal family assistance plan a tribal family assistance grant for the fiscal year." 42 U.S.C. § 612(a)(1)(A). TANF mandates that "[e]ach Indian tribe to which a grant is made ... shall use the grant for the purpose of operating a program to make work activities available to such population and such service area or areas as the tribe specifies." 42 U.S.C. § 612(a)(2)(C). Finally, TANF gives Indian tribes somewhat more flexibility than states in applying for block grants. The Secretary of Labor, for instance, is permitted to waive or modify a set of limitations normally imposed on states, *see* 42 U.S.C. § 603(a)(5)(C), "to the extent necessary to enable the Indian tribe to operate a more efficient or effective program." 42 U.S.C. § 612(a)(3)(C)(ii).

In addition, TANF ensures that the state will provide aid to tribal members who are not part of a tribal assistance program. For a state to be eligible for TANF funds, the state must certify that it "will provide each member of an Indian tribe, who is domiciled in the State and is not eligible for assistance under a tribal family assistance plan ... with equitable access to assistance under the State program funded under this part attributable to funds provided by the Federal Government." 42 U.S.C. § 602(a)(5).

Notwithstanding PRWORA's explicit funding provision for Indian tribes, the Navajo Nation ("the Tribe") applied in October 1997 to the Secretary of HHS for TANF funds through the ISDEAA. The ISDEAA directs the Secretaries of the Interior and of Health and Human Services,

upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs—

(A) provided for in the [Johnson–O'Malley] Act of April 16, 1934 (48 Stat. 596), as amended;

(B) which the Secretary is authorized to administer for the benefit of Indians under the [Snyder] Act of November 2, 1921 (42 Stat. 208), and any Act subsequent thereto;

(C) provided by the Secretary of Health and Human Services under the [Transfer] Act of August 5, 1954 (68 Stat. 674), as amended;

(D) administered by the Secretary for the benefit of Indians for which appropriations are made to agencies other than the Department of Health and Human Services or the Department of the Interior; and

(E) for the benefit of Indians because of their status as Indians without regard to the agency or office of the Department of Health and Human Services or the Department of the Interior within which it is performed.

25 U.S.C. § 450f(a)(1)(A)-(E). A self-determination contract is defined as "a con-

tract ... entered into ... between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j).

The Tribe applied for a self-determination contract under § 450f(a)(1)(E), claiming that TANF is a program for the benefit of Indians because of their status as Indians. The Tribe chose to apply for TANF funds through the ISDEAA rather than through PRWORA primarily because the ISDEAA provides supplemental administrative funds in addition to the money for the contracted programs. *See* 25 U.S.C. § 450j–1(a)(2) ("There shall be added to the amount[of funds provided under the self-determination contract] ... contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor....").

The Secretary of HHS, in a November 1997 letter to the Tribe, rejected the Tribe's application because "the TANF program is beyond the scope of programs ... authorized under the [ISDEAA]." Section 450f(a)(2)(E) authorizes the Secretary to reject a self-determination contract if "the program, function, service, or activity ... that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered." The Secretary observed that because TANF was "intended to operate for the benefit of needy families without consideration for the status of these families as Indian or non-Indian," it did not satisfy § 450f(a)(1)(E). She also determined that a contract for TANF funds did not fall within the statutory definition of a "self-determination contract" because the "TANF program is not a program under

which the Federal government would otherwise directly provide services to Indian tribes pursuant to Federal law.... At no time is TANF assistance planned, conducted or administered by the Federal government." *See* 25 U.S.C. § 450b(j).

When the Tribe attempted to appeal the Secretary's decision through administrative channels, the Board of Indian Appeals determined that the only remedy available was a federal court challenge. Accordingly, the Tribe filed suit in federal court in Arizona, seeking an order requiring the Secretary to enter into a self-determination contract with the Tribe for TANF funds. The Secretary filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), urging dismissal on the same grounds set out in her rejection letter. In granting the motion to dismiss, the district court found that "[b]ecause the TANF is not a program providing or administering services directly to Indian tribes ... TANF is not a program contractable under the [ISDEAA]." The Tribe's appeal of the district court's ruling presents a purely legal issue that we review de novo. *Shannon–Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir.2001).

## DISCUSSION

 In interpreting the statutes in question, "[o]ur task is to construe what Congress has enacted. We begin, as always, with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). A plain reading of the language of the two statutes leads us to conclude that the IS-DEAA is not available as an alternate route for administration of TANF funds because TANF is not a program "for the benefit of Indians because of their status as Indians."[4] 25 U.S.C. § 450f(a)(1)(E).

---

**4.** At the original panel's direction, the parties submitted supplemental briefs on the applica-

Further, because TANF simply makes block grants available to the states as a funding mechanism rather than placing the federal government in the role of providing welfare services, TANF is not a federal program subject to contracting under the ISDEAA.

To understand why TANF is not contractable, it is instructive to walk through the language of the ISDEAA. The self-determination contract provision authorizes contracts for "programs or portions thereof" falling within one of five categories. *See* 25 U.S.C. § 450f(a)(1)(A)-(E). The first three categories refer to specific statutes that fund programs under which tribes may apply for self-determination contracts. *Id.* at (A)-(C). These subsections help delineate the boundaries of programs that are "for the benefit of Indians because of their status as Indians," *id.* at (E), and illustrate the types of initiatives that constitute "programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law," 25 U.S.C. § 450b(j). The final two categories spell out more general requirements for self-determination contracts. 25 U.S.C. § 450f(a)(1)(D), (E).

Subsection (A) relates to the Johnson O'Malley Act of 1934, which is directed primarily at education of Native American students. 25 U.S.C. § 452; *see also Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue,* 458 U.S. 832, 839–40, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982) (noting that the Johnson–O'Malley Act is one of "numerous statutes empowering the [Bureau of Indian Affairs ('BIA')] to provide for Indian education both on and off the reservation"). The Act authorizes the Secretary of the Interior "to enter into a contract ... with any State ... for the education, medical attention, agricultural assistance, and social welfare, including relief of distress, of Indians in such State." 25 U.S.C. § 452. The federal regulations specify that "education contracts under the Johnson–O'Malley Act ... shall be for the purpose of financially assisting those efforts designed to meet the specialized and unique educational needs of eligible Indian students." 25 C.F.R. § 273.1(a).

The Snyder Act of 1921, the subject of subsection (B), further serves to illustrate the type of program for which Congress contemplated allowing tribes to contract. The Snyder Act authorizes the BIA to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States" for purposes including

tion of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and devoted a substantial portion of their en banc argument to this issue. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (holding that "if [a] statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"). Because the original panel opinion has been withdrawn and because we now conclude that the ISDEAA is not ambiguous, neither *Chevron* nor the *Blackfeet Tribe* presumption in favor of Indian tribes is implicated. *See Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753

(1985) (holding that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"). Thus, we leave for another day consideration of the interplay between the *Chevron* and *Blackfeet Tribe* presumptions. *Compare, e.g., Williams v. Babbitt,* 115 F.3d 657, 663 n. 5 (9th Cir.1997) (deferring to agency interpretation under *Chevron* notwithstanding pro-Indian presumption), and *Seldovia Native Ass'n, Inc. v. Lujan,* 904 F.2d 1335, 1342 (9th Cir.1990) (same), *with Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455, 1461–62 (10th Cir.1997) (holding that *Blackfeet Tribe* trumps *Chevron* ), and *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 59 (D.C.Cir. 1991) (same).

"[g]eneral support and civilization," "relief of distress and conservation of health," and assistance with property, employment, and "administration of Indian affairs." 25 U.S.C. § 13. As with the Johnson–O'Malley Act, the Snyder Act is directed solely to Indian welfare.

Similarly, the Transfer Act of 1954, referenced in subsection (C), transfers "the maintenance and operation of hospital and health facilities for Indians ... to ... the United States Public Health Service." [5] 42 U.S.C. § 2001(a). The Act authorizes the Secretary "to contract with private or other non-Federal health agencies or organizations for the provision of health services to [Indians]." 42 U.S.C. § 2001(b).

The language of these provisions underscores that programs or services that are "for the benefit of Indians because of their status as Indians" must be federal programs specifically targeted to Indians and not merely programs that collaterally benefit Indians as a part of the broader population, as is the case with TANF. Indeed, the federally administered nature of these Indian-specific programs is the antithesis of TANF's pass-through approach.

The fourth subsection, (D), covers programs "administered by the Secretary for the benefit of Indians for which appropriations are made to agencies *other* than the Department of Health and Human Services or the Department of the Interior."

25 U.S.C. § 450f(a)(1)(D) (emphasis added). Because TANF is funded by Health and Human Services, the Tribe did not apply for block grants pursuant to (D). This subsection therefore does not control our analysis, except to reinforce that the ISDEAA is directed to programs "administered by the Secretary for the benefit of Indians." *Id.*

We turn now to the last category of § 450f(a)(1), subsection (E), which requires that contractable programs be "for the benefit of Indians because of their status as Indians." Although this provision is broader than the preceding sections because it is not necessarily tied to a specific congressional enactment, the focus of the requirements remains the same—federal programs targeted specifically at Indians. We conclude that because TANF is not a federal program designed specifically to benefit Indians, it does not fall under § 450f(a)(1)(E). Although TANF funds are available to Indian tribes who submit a funding plan, they are equally available to states that follow similar guidelines. The independent tribal funding sections of TANF are merely meant to give tribes flexibility with respect to administration of welfare funds, not to invest the Secretary of HHS with particular responsibility for meeting the welfare needs of Indian tribal members.[6] *See Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455, 1456 (10th Cir.1997)

---

**5.** In fact, the BIA's responsibilities regarding the "conservation of the health of Indians" under the Snyder Act were among those transferred to HHS pursuant to the Transfer Act. *See Lincoln v. Vigil,* 508 U.S. 182, 185 n. 1, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

**6.** By way of example, one of the federal programs funded by the Snyder Act, and thus contractable under the ISDEAA, stands in contrast to the Secretary's authority under TANF. The Indian Health Care Improvement Act ("IHCIA") permits the Secretary of the Interior "to expend funds ... for the purposes of (1) eliminating the deficiencies in health

status and resources of all Indian tribes." 25 U.S.C. § 1621(a)(1). Specifically, it authorizes the Secretary's expenditure of funds for, among other things, "meeting the health needs of Indians" and "augmenting the ability of the [Indian Health] Service to meet ... health service responsibilities ... with respect to those Indian tribes with the highest levels of health status and resource deficiencies." 25 U.S.C. § 1621(a)(3), (4). Unlike TANF, the IHCIA is notable for "Congress' recognition of *federal responsibility* for Indian health care." *McNabb v. Bowen,* 829 F.2d 787, 792 (9th Cir.1987) (emphasis added).

(noting that with regard to programs that are contractable under the ISDEAA, "the Secretaries continue to provide direct services to a tribe until such time as the tribe chooses to enter into a 'self-determination contract' to operate those services"); *accord FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir.1995) (explaining that self-determination contracts allow tribes "to plan, conduct and administer a program or service that the federal government otherwise would have provided directly"). With TANF, the Secretary does not provide any such direct services.

Thus, as described above, the ISDEAA sets forth five categories of programs as to which self-determination contracts are authorized: programs under the Johnson–O'Malley, Snyder, and Transfer Acts; programs "administered by the Secretary for the benefit of Indians for which appropriations are made to agencies other than" HHS or the Department of the Interior; and programs "for the benefit of Indians because of their status as Indians." TANF does not fall into any of these categories. It is a block-grant program, not a program previously administered by the government and transferred to the grant recipient with administrative obligations attached. TANF is deemed to include administrative funds; awarding additional administrative funds is inconsistent with the block-grant concept. We therefore hold that TANF does not qualify as an "otherwise contractable program" under the ISDEAA.

TANF's limited but specific reference to the ISDEAA provides further support for our reading of the statutes. TANF references the ISDEAA only in two places and only in regard to the ISDEAA's fiscal accountability provisions;[7] notably absent is any reference to administration of the program under the ISDEAA. The subsection that addresses tribal family assistance grants specifies, among other things, that the tribe must submit to the Secretary of Health and Human Services a three-year tribal family assistance plan that "applies the fiscal accountability provisions of section 5(f)(1)" of the ISDEAA. 42 U.S.C. § 612(b)(1)(F). This fiscal provision relates to the submission of a single-agency audit report. The ISDEAA is also referred to in the general accountability section, which states that "[n]othing in this section shall be construed to limit the ability of the Secretary to maintain program funding accountability consistent with (1) generally accepted accounting principles; and (2) the requirements of the Indian Self–Determination and Education Assistance Act." 42 U.S.C. § 612(e).

These references indicate that Congress was fully aware of the ISDEAA—which was passed more than two decades before PRWORA—when it enacted the TANF provisions. Nonetheless, Congress specifically chose to invoke only the fiscal provisions of the ISDEAA rather than the section allowing tribes to apply for self-determination contracts.[8] Even the incorporation of the ISDEAA was done with

7. The IHCIA, however, explicitly mentions the self-determination contract provisions of the ISDEAA, signaling that Congress knows how to speak clearly when it contemplates that a program is contractable under the ISDEAA. *See* 25 U.S.C. § 1621(d)(1) ("Programs administered by any Indian tribe or tribal organization under the authority of the Indian Self–Determination Act shall be eligible for funds appropriated under [the Indian Health Care Improvement Fund] on an equal basis with programs that are administered directly by the [Indian Health] Service.").

8. We presume that Congress "kn[ew] of its former legislation ... and passed ... new laws in view of the provisions of the legislation already enacted." *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir.1992) (citations and internal quotation marks omitted).

surgical precision. The only requirement actually incorporated by reference is the single-agency audit report. The general accountability reference simply makes clear that the Secretary's hands are not tied with respect to the requirements of funding accountability.

The Tribe argues that TANF's character as a block grant funding mechanism rather than a federal program is not dispositive. The Tribe asserts that the BIA, through the Department of the Interior, also provides tribal welfare and social services programs, and that such programs are contractable under the ISDEAA. The Tribe points to 25 C.F.R. Part 20, in which the BIA lays out a comprehensive scheme for Indian welfare and social services, and specifically 25 C.F.R. §§ 20.1(t) and 20.21(e), which refer to AFDC and establish eligibility requirements tracking the state's AFDC eligibility assessments. The Tribe reasons that if that welfare scheme was contractable, TANF must be as well.

The pitfall in this argument is that the contractable welfare programs at issue in 25 C.F.R. Part 20 were federally administered programs specifically funded by the Snyder Act as a general assistance program for needy Indians.[9] In October of 2000, however—after the parties filed their initial briefs—the BIA amended 25 C.F.R. Part 20, withdrawing the sections cited by the Tribe and issuing new regulations under 25 C.F.R. §§ 20.100–20.705, which outline the universe of financial assistance and social services programs available to Indian tribes. *See* Financial Assistance and

Social Services Programs, 65 Fed.Reg. 63144 (Oct. 20, 2000). Under the new rule, tribes have "the option of operating their own general assistance program through a redesign plan which incorporates welfare reform or utilizing the Bureau's revised regulations on general assistance as a program standard for operation." *Id.* at 63144. Such a general assistance program is, however, a supplement to TANF, not an equivalent. Under the new rule, "[t]he Bureau can provide assistance under this part to eligible Indians when comparable financial assistance or social services are either not available or not provided by state, tribal, county, local or other federal agencies." 25 C.F.R. § 20.102(b). The BIA further explains, in response to comments on the rule, that "all applicants with dependent children are required to apply for TANF as general assistance is a secondary source." 65 Fed.Reg. at 63152. Consequently, the fact that some general welfare assistance is contractable under the ISDEAA tells us little about the contractability of TANF.

Finally, the Tribe places great weight on ISDEAA policy statements that direct "liberal[ ] constru[ction]" of the ISDEAA with regard to programs that are "otherwise contractable" under the Act. *See* 25 C.F.R. § 900.3(a)(5). Such a liberal construction, however, does little to change whether a program is "otherwise contractable" In fact, the policy behind the ISDEAA bolsters our conclusion.[10]

---

**9.** *See Wilson v. Watt,* 703 F.2d 395, 397 (9th Cir.1983) ("The BIA regulations implementing the Snyder Act provide for the federal general assistance program at issue in this case. 25 C.F.R. § 20.21 (1982). The general assistance program is available to needy Indians, who are ineligible for other federal assistance and who reside in states where comparable general assistance is not available or is not being provided to all residents on the

same basis.") (footnote and second and third internal statutory citations omitted).

**10.** *See N.W. Forest Res. Council v. Glickman,* 82 F.3d 825, 830 (9th Cir.1996) (holding that in interpreting a statute we examine the "provisions of the entire law, including its object and policy, to ascertain the intent of Congress") (citations and internal quotation marks omitted).

■ The relevant congressional declaration of policy is twofold: First, "Congress ... recognizes the [federal government's] obligation ... to ... assur[e] maximum Indian participation in the direction of ... Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities." 25 U.S.C. § 450a(a). Second, the self-determination policy is intended to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b). Thus, a primary purpose of the ISDEAA is to give tribes increased control over their own affairs and to shift responsibility for the administration of federal programs to tribes.[11] TANF, by contrast, is not such a federal program. If a tribe does not seek direct funding and does not submit a plan, tribal members still have access to TANF funds—but through the states, not from the federal government. The bottom line is that TANF's block grant, pass-through structure is not a federal welfare program "for the benefit of Indians because of their status as Indians." Because TANF is not "otherwise contractable" under the ISDEAA, the "liberal[ ] constru[ction]" advisory does not affect the outcome here.

### CONCLUSION

Based upon our analysis of the plain language of the two statutes, buttressed by the Acts' stated policies, we conclude that TANF is neither a "program[ ] or service[ ]" that is "otherwise provided" to Indian tribes under federal law, nor is it "for the benefit of Indians because of their status as Indians." *See* 25 U.S.C. §§ 450b(j), 450f(a)(1)(E). Therefore, the TANF program is not a contractable program under the self-determination provisions of the ISDEAA.

AFFIRMED.

---

**11.** President Nixon, in describing the ISDEAA's original purpose, stated: "In my judgment, it should be up to the Indian tribe to determine whether it is willing to assume administrative responsibility for a service program *which is presently administered by a Federal agency*." S.Rep. No. 100–274, at 3 (1987) (emphasis added). The Senate Report on the 1988 Amendments to the ISDEAA emphasizes that "both the Congress and the Executive branch envisioned a clear-cut transfer of federal responsibilities ... to the tribes." *Id.* at 6.