**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOOPA VALLEY INDIAN TRIBE, a
federally recognized Indian tribe,
        *Plaintiff-Appellant,*

        v.

MICHAEL J. RYAN, Northern Area
Manager, Bureau of Reclamation;
GALE A. NORTON, Secretary of the
Interior; UNITED STATES OF
AMERICA,
        *Defendants-Appellees.*

No. 03-16940

D.C. No.
CV-02-00041-SC

OPINION

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Argued and Submitted
April 14, 2005—San Francisco, California

Filed July 8, 2005

Before: Procter Hug, Jr., David R. Thompson, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Hug

**COUNSEL**

Kyme A. M. McGaw, Thomas P. Schlosser, Morisset, Schlosser, Jozwiak, & McGaw, Seattle, Washington, for the appellant.

John S. Koppel, Attorney, Civil Division, Department of Justice, Washington, D.C., for the appellees.

**OPINION**

HUG, Circuit Judge:

In an effort to address ongoing declines in salmon and steelhead populations in the Trinity River basin, the Bureau of Reclamation adopted a multifaceted restoration program. The Hoopa Valley Indian Tribe sought funding to implement many of the proposed restoration projects under the mandatory contracting provisions of the Indian Self-Determination and Education Assistance Act. After the Bureau refused to execute mandatory contracts for the Tribe's proposals, the Tribe brought suit. On cross-motions for summary judgment, the district court held that the programs at issue are not "for the benefit of Indians because of their status as Indians," and thus are not eligible for mandatory contracts. We have jurisdiction over the Tribe's appeal under 28 U.S.C. § 1291, and we affirm.

I

The Trinity River, originating in the coastal mountains of Northern California, flows through the Hoopa Valley Indian Reservation before joining with the Klamath River and emptying into the Pacific Ocean. The Klamath-Trinity river system historically produced bountiful runs of salmon and steelhead. These fisheries played a central role in the livelihood and culture of the Hoopa Valley and Yurok Indian Tribes, as well as in the region's economy and way of life as a whole. Beginning in the latter half of the last century, however, the river was dammed and nearly all of its water was diverted to agricultural uses in California's Central Valley. The Trinity's legendary fishery, and those dependent on it, suffered dearly as a result.[1]

In 1955, Congress authorized the Trinity River Division, a system of dams and diversions that ultimately diverted nearly ninety percent of the upper river's inflow to the Central Valley. The Division eliminated more than 100 miles of upstream spawning habitat, dramatically reduced downstream flows necessary to flush fine sediment from the gravel beds in which the fish spawned, contributed to channelization of the river, and otherwise degraded what habitat remained below the dams. By 1980, suitable habitat was all but eliminated from the river, and salmon and steelhead populations had plummeted by as much as eighty percent.

Congress has taken steps to mitigate the impact of the Trinity River Division. In the legislation first authorizing the Division, Congress directed the Secretary of the Interior to "adopt appropriate measures to insure the preservation and propagation of fish and wildlife," including a minimum summer flow

---

[1]We recently recounted the history of the river, including the dramatic decline of its fisheries and the government's restoration efforts, in *Westlands Water District v. United States Department of the Interior*, 376 F.3d 853, 860-64 (9th Cir. 2004).

below the diversion of 150 cubic feet per second. Pub. L. No. 84-386, § 2, 69 Stat. 719 (1955). In 1980, Congress appropriated additional funds to remedy sediment problems originating in Grass Valley Creek, a tributary of the Trinity. Pub. L. No. 96-335, 94 Stat. 1062 (1980).

As the situation on the river grew more dire, Congress responded with the Trinity River Basin Fish and Wildlife Management Act, Pub. L. No. 98-541, 98 Stat. 2721 (1984) (hereafter "1984 Act"), which directed the Secretary to "formulate and implement" a restoration program "designed to restore the fish and wildlife populations in [the Trinity River] basin to the levels approximating those which existed immediately before" construction of the Division. *Id.* at § 2(a). This legislation also required the Secretary to enter into a memorandum of agreement with the Hoopa Valley Tribe in order to "facilitate the implementation of those activities . . . over which the Secretary does not have jurisdiction." *Id.* at § 2(b)(2). It also provided for appointment of a Hoopa Valley Tribe representative to the newly created Trinity River Basin Fish and Wildlife Task Force. *Id.* at § 3(a)(14).

In 1996, Congress reauthorized and expanded the 1984 Act, mandating that the success of restoration be measured in part "by the ability of dependent tribal, commercial, and sport fisheries to participate fully, through enhanced in-river and ocean harvest opportunities, in the benefits of restoration." Trinity River Basin Fish and Wildlife Management Reauthorization Act of 1995, Pub. L. No. 104-143, § 2(2), 110 Stat. 1338 (1996). Congress also added the long-term goal of "aid[-ing] in the resumption of commercial, including ocean harvest, and recreational fishing activities," and allowed representatives of the Yurok and Karuk Tribes to serve on the Task Force. *Id.* at §§ 2(3), 4(a)(3).

Although direct funding for activities under the 1984 and 1996 Acts expired on October 1, 1998, *id.* at § 5(a)(1), Congress separately continued to support Trinity River restoration

through the Central Valley Project Improvement Act, Pub. L. No. 102-575, §§ 3401-3412, 106 Stat. 4600, 4706-31 (1992) (hereafter "CVPIA"). Specifically, "in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals" of the 1984 Act, Congress directed the Secretary to provide a minimum instream release of water into the Trinity River and to consult with the Hoopa Valley Tribe in completing a "Trinity River Flow Evaluation Study" that could lead to further increases in the minimum flow. *Id.* at § 3406(b)(23), 106 Stat. 4720-21.

Following completion of this study, the Department of the Interior finalized its Trinity River Mainstem Restoration Program and issued a Record of Decision. The Record of Decision recommended variable increases in the amount of water released into the river, depending on water availability during any given year. The document also recommended other restoration measures, including mechanical channel rehabilitation, sediment management and watershed restoration programs, adaptive management, and monitoring. The Department also reaffirmed that congressional mandates, grounded in the federal government's trust responsibilities to the Hoopa Valley and Yurok Tribes, required restoration of Trinity River salmon and steelhead populations to levels existing before the dams were built.

The Hoopa Valley Tribe first proposed a mandatory "self-determination contract," under the Indian Self-Determination and Education Assistance Act (hereafter "ISDEAA"), for Trinity River restoration activities in August, 1999. The Bureau of Reclamation denied the Tribe's proposal, finding that Trinity River restoration was a national program designed to benefit the public as a whole rather than the Tribe in particular. The Tribe appealed to the Interior Board of Indian Appeals, which affirmed the Bureau's decision in part. The Administrative Law Judge found that the particular programs, functions, services, and activities related to the Trinity Flow

Study and the Record of Decision were eligible for a self-determination contract because these activities were directly connected to tribal authority granted under the CVPIA. The judge also concluded, however, that the other proposed restoration projects could not be funded under self-determination contracts because they were designed to benefit the public as a whole rather than "Indians because of their status as Indians."

The Tribe again sought mandatory contracts for fiscal year 2002 covering nineteen restoration activities, many of which involved monitoring, channel rehabilitation, and fishery enhancement activities affecting habitat throughout the Trinity River system. The Bureau again denied the Tribe's request, citing the reasoning in the Administrative Law Judge's decision. The Tribe responded with another proposed scope of work for mandatory contracts, this time encompassing twenty-six restoration activities. The Bureau, once again employing the Administrative Law Judge's criteria, found that only two of the proposed activities (those related to the Trinity Flow Study process) fell within the mandatory contracting provisions of ISDEAA. Disagreeing with the Bureau's analysis, the Tribe submitted a "last best offer" covering nineteen activities. The Bureau again determined that most of the activities were not eligible for mandatory self-determination contracts, but offered to negotiate discretionary funding for those activities under a separate ISDEAA provision.

The Tribe then filed suit in the district court challenging the Bureau's interpretation of ISDEAA. In paragraph 41 of its complaint, the Tribe specified five activities for which it sought mandatory contracts: (A) basic sediment transport monitoring; (B) channel rehabilitation site physical monitoring; (C) rehabilitation site biological monitoring; (D) mainstem outmigrant monitoring; and (E) participation in the Channel Restoration Subcommittee. The Tribe also sought a declaratory judgment that all other programs, services, functions, and activities necessary to implement the Record of

Decision were eligible for mandatory self-determination contracts. On cross-motions for summary judgment, the district court held that restoration activities designed to benefit the Trinity River and its users as a whole, rather than the Tribe in particular, did not fall within ISDEAA's mandatory contracting provisions. The Tribe timely appealed.

## II

We review the district court's decision on cross-motions for summary judgment de novo. *See United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).

## III

We first examine whether the district court correctly concluded that Trinity River restoration programs do not fall within the mandatory contracting provisions of the ISDEAA. We then address the Tribe's argument that the government's trust obligations, as acknowledged in the various statutes governing Trinity River restoration, require the Bureau to execute mandatory contracts.

## A

Contracts between the federal government and Indian tribes under the ISDEAA take two basic forms. Under Title I of the ISDEAA, tribes are entitled to enter into "self-determination" contracts, defined as contracts "for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j). The government *must* enter into self-determination contracts allowing tribal organizations to plan, conduct, and administer certain federal programs, including programs "for the benefit of Indians because of their status as Indians." 25 U.S.C. § 450f(a)(1)(E). In other words, self-determination contracts are mandatory rather than discretionary.

Tribes also may obtain mandatory contracts under Title IV of the ISDEAA, which allows Tribes participating in "self-governance" to negotiate comprehensive "annual funding agreements" containing contracts for a wide range of programs. *See generally* 25 U.S.C. § 458aa-458hh. The Department of Interior is *required* to negotiate contracts for administration of Department "programs, services, functions, and activities" that are "otherwise available" to Indian tribes or Indians. 25 U.S.C. § 458cc(b)(2). The Department has interpreted "otherwise available" as describing programs eligible for self-determination contracts under Title I. *See* Final Rule, 65 Fed. Reg. 78,688, 78,695 (Dec. 15, 2000). In other words, tribes participating in self-governance under Title IV may incorporate mandatory self-determination contracts—including contracts for programs "for the benefit of Indians because of their status as Indians"—in their annual funding agreements with federal agencies. *See* 25 C.F.R. §§ 1000.123, 1000.124.[2]

Title IV also gives federal agencies discretion to fund programs and activities that are not eligible for self-determination contracts. Annual funding agreements "may . . . also include other programs, services, functions, and activities, or portions thereof, administered by the Secretary of the Interior which are of special geographic, historical, or cultural significance to the participating Indian tribe requesting a compact." 25 U.S.C. § 458cc(c). The Department has interpreted this subsection as granting the government discretion to fund programs "that may coincidentally benefit Indians but that are national in scope and [are] not by definition 'programs for the benefit of Indians because of their status as Indians.' " 65 Fed. Reg. at 78,695. The Department's final regulations reflect this view. *See generally* 25 C.F.R. §§ 1000.122-1000.136.

---

[2]The Department's Federal Register notice and final regulations refer to Title I of the ISDEAA by its Public Law number, 93-638.

**[1]** Therefore, the Secretary of the Interior *must* enter into contracts with tribes for the planning, conduct, and administration of federal programs "for the benefit of Indians because of their status as Indians," whether the Secretary does so under Title I or Title IV of the ISDEAA. The Secretary also has *discretion* to negotiate (in annual funding agreements under Title IV) contracts for other programs which, although "of special geographic, historical, or cultural significance" to Indians, are national rather than narrowly tribal in scope.

The Tribe argues that Trinity River restoration programs are activities "for the benefit of Indians because of their status as Indians," and therefore are eligible for mandatory inclusion within the Tribe's annual funding agreements under Title IV of the ISDEAA. The Bureau contends, and the district court agreed, that the restoration program is designed to benefit the public in general rather than the Tribe in particular, and that the mandatory self-determination contracting provisions of the ISDEAA are therefore inapplicable.

**[2]** We recently examined the scope of federal programs "for the benefit of Indians because of their status as Indians" in concluding that the Navajo Nation was not entitled to a mandatory contract for administration of the Temporary Assistance to Needy Families (TANF) program. *Navajo Nation v. Dep't of Health & Human Servs.*, 325 F.3d 1133 (9th Cir. 2003) (en banc). We held that TANF, a "pass-through program that funnels federal money to states for state-run welfare programs," was not "a federal program designed specifically to benefit Indians." *Id.* at 1135, 1138. In so holding, we contrasted TANF with other programs statutorily eligible for mandatory self-determination contracting under Title I of the ISDEAA. *See id.* at 1137-38 (discussing 25 U.S.C. § 450f(a)(1)(A)-(C)). All of those programs—covering contracts under the Johnson O'Malley Act for Indian education, under the Snyder Act for general support of Indian welfare, and under the Transfer Act of 1954 for maintenance and operation of Indian health care facilities—are "specifi-

cally targeted to Indians and not merely programs that collaterally benefit Indians as a part of the broader population, as is the case with TANF." *Id.* at 1138. Accordingly, we held that TANF is not a program eligible for mandatory contracting under 25 U.S.C. § 450f(a)(1)(E).

[3] Like TANF, the Trinity River restoration program is not "specifically targeted" to Indians, but rather is intended to benefit a far wider range of interests in the Trinity River and its fisheries. The 1984 Act, which first established the goal of restoring fish populations to pre-dam levels, contemplated that state, local, and tribal participation would be necessary to achieve this goal, and included representatives of these interests on the Trinity River Basin Fish and Wildlife Task Force. Pub. L. No. 98-541, § 3(a), 98 Stat. 2721, 2722-23 (1984). The 1996 amendments to the 1984 Act clarified that restoration would be measured in part "by the ability of dependent tribal, commercial, and sport fisheries to participate fully, through enhanced in-river and ocean harvest opportunities, in the benefits of restoration." Pub. L. No. 104-143, § 2(2), 110 Stat. 1338 (1996). Congress also stated that the Trinity Basin fish and wildlife management program, if successful, would "aid in the resumption of commercial, including ocean harvest, and recreational fishing activities." *Id.*, § 2(3). These amendments show a clear intent to benefit the entire range of interests dependent upon a restored Trinity River fishery.

[4] We also must be careful to identify the precise benefits Congress intended to confer by authorizing restoration: increased populations of salmon and steelhead, more abundant in-river and ocean harvests, and recovery of tribal as well as non-tribal commercial and recreational fisheries. These benefits will accrue to the Tribe and others no matter who does the actual restoration work. It is undisputed that the Tribe is eligible to apply for funds to do this work.[3] There is

---

[3]Indeed, the Bureau ultimately funded fourteen of the nineteen projects proposed by the Tribe in its "last best offer" and paid the Tribe $1,606,472

nothing in the relevant statutes or elsewhere in the record, however, showing that Congress "specifically targeted" the Tribe in its capacity as a *restoration contractor* rather than as one ultimate beneficiary of a restored fishery.

[5] Accordingly, in comparison to other programs eligible for self-determination contracts, *see* 25 U.S.C. § 450f(a)(1)(A)-(C), the Trinity River restoration program is not "specifically targeted" to the Hoopa Valley Tribe, but rather "collaterally benefit[s] Indians as a part of the broader population." *Cf. Navajo Nation*, 325 F.3d at 1138. Although Congress clearly intended that the Tribe should benefit from a restored fishery, nothing in the authorizing statutes or the Record of Decision suggests that Congress "specifically targeted" the tribe as a beneficiary of funding for the particular restoration projects listed in Paragraph 41 of the Tribe's complaint. Therefore, the Bureau's restoration projects were not proposed "for the benefit of Indians because of their status as Indians," 25 U.S.C. § 450f(a)(1)(E), and thus are not eligible for mandatory self-determination contracting under either Title I or Title IV of the ISDEAA.[4]

for that work. The Bureau offered to include the five remaining projects under a discretionary contract, but the Tribe declined so that it could bring suit challenging the Bureau's refusal to execute *mandatory* contracts. Those five remaining projects are the ones listed in Paragraph 41 of the Tribe's complaint.

[4]We generally agree with the Tribe that a statutory scheme as a whole need not be *exclusively* targeted to Indians in order to create eligibility for mandatory self-determination contracts. The CVPIA provides an excellent example of a statute that both specifically targets some benefits to Indians and more generally directs other benefits to a wider population. *See* CVPIA § 3406(b)(23)(A), (B) (specifically providing for the Tribe's participation in the Trinity Flow Evaluation Study and allowing for future flow increases with the Tribe's concurrence). The Bureau agreed that the Tribe's participation in these activities could be funded under a mandatory self-determination contract. Other restoration activities proposed by the Tribe, however, were intended by Congress to benefit a wider population. We merely follow *Navajo Nation* in holding that those activities are ineligible for mandatory contracts.

B

The Tribe argues that the government's obligation as a trustee must take precedence over its other statutory obligations. In the Tribe's view, congressional acknowledgment of this trust obligation in the CVPIA means that the Tribe's interest trumps all others recognized in the statutes authorizing Trinity River restoration. We disagree.

**[6]** The Supreme Court has long recognized "the distinctive obligation of trust" that binds the government in its dealings with Indian people. *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942). In carrying out its treaty obligations, the government

> is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards.

*Id.* at 296-97. As the Tribe points out, we have "read the [trust] obligation to extend to any federal government action." *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990). Accordingly, the Bureau's actions here must be viewed in light of the obligations imposed by the trust doctrine.

**[7]** The government's trust obligations, however, can coexist with its other responsibilities. *See, e.g.*, *Nevada v. United States*, 463 U.S. 110, 128, 142-43 (1983) (recognizing the government's dual statutory obligations to Indian tribe and water users, but declining to evaluate government's representation of both interests according to private-law fiduciary

standards); *Arizona v. California*, 460 U.S. 605, 626-27 (1983) (finding no conflict of interest in the government's simultaneous representation of Indians' water rights and its own interests in securing water for other federal property, notwithstanding its fiduciary obligation to Indians); *see also* CONFERENCE OF W. ATTORNEYS GENERAL, AMERICAN INDIAN LAW DESKBOOK 14-16 & n. 83 (3d ed. 2004). Clearly, the government may satisfy a range of statutory responsibilities while still honoring its trust obligations to Indians.

*Pyramid Lake Paiute Tribe* is especially instructive here. In that case, the Department of the Navy was diverting water from the Truckee River to support irrigated "buffer zones" along runways at an airbase near Fallon, Nevada. 898 F.2d at 1412. The Pyramid Lake Paiute Tribe sued, arguing that the diversions reduced the water level in Pyramid Lake and imperiled a critical tribal fishery. *Id.* at 1413. We held that because the Navy had complied with the Endangered Species Act in implementing the diversions, it had taken steps necessary to conserve the tribal fishery, and therefore had not violated its trust obligations. *See id.* at 1420-21.

**[8]** Here, the Bureau is implementing a restoration program specifically designed to improve the Trinity River fishery and thereby to benefit the Tribe along with other dependent interests. This program honors the trust obligation recognized in the CVPIA: "to protect the fishery resources of the Hoopa Valley Tribe." CVPIA § 3406(b)(23). The government need not provide the Tribe with an exclusive or primary right to restoration contracts, however, in order to fulfill this obligation. Indeed, the 1996 amendments to the 1984 Act specifically provided that "[n]othing in this Act shall be construed as establishing or affecting any past, present, or future rights of any Indian or Indian tribe or any other individual or entity." Pub. L. No. 104-143, § 6, 110 Stat. 1338, 1341 (1996). Had Congress wished to establish any entitlement to or preference for restoration contracts throughout the Trinity River basin, it

easily could have done so. *Cf. Navajo Nation*, 325 F.3d at 1139 n.7.

**[9]** It is indisputable that the United States and the Bureau have a fiduciary obligation of the highest order in their dealings with the Tribe. Congress has properly recognized in this obligation the duty to conserve and restore the Trinity River and its fisheries. The Bureau has not violated its trust obligation to the Tribe, however, by determining that contracts for the restoration work itself should be negotiated under the discretionary, rather than the mandatory, provisions of the ISDEAA.

## IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.