**HOPLAND BAND OF POMO INDIANS, Plaintiff,**

**v.**

**Gale NORTON, Secretary of the Interior; David Anderson, Assistant Secretary of Indian Affairs; Clay Gregory, Acting Regional Director, Pacific Regional Office, Bureau of Indian Affairs; and Dale Risling, Sr., Superintendent of the Central California Agency of Bureau of Indian Affairs, Defendants.**

**No. C 04–00102–WHA.**

United States District Court, N.D. California.

July 1, 2004.

Lester John Marston, Esq., Rapport & Marston, Ukiah, CA, for Plaintiff.

Owen Peter Martikan, United States Attorney, San Francisco, CA, for Defendants.

## ORDER DENYING MOTION TO DISMISS

ALSUP, District Judge.

### INTRODUCTION

This case presents an issue of first impression whether the "contractible programs" authorized by the Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. 450 et seq., include the contracts contemplated by the Indian Law Enforcement Reform Act of 1990, 25 U.S.C. 2801 et seq. This order holds in the affirmative and therefore denies the government's motion to dismiss.

### STATEMENT

The Hopland Band of Pomo Indians is a federally-recognized Indian tribe. The tribe is the beneficial owner of the Hopland Indian Reservation, which covers approximately 2,070 acres of trust and fee land in Mendocino County, California. The tribe exercises powers of self-government on its reservation through the Hopland Tribal Council, its governing body.

Pursuant to the authority granted to it under the Hopland constitution, the tribal council adopted an ordinance in July 2002 creating the Hopland Police Department, which provides law enforcement on the reservation to all persons who live, work and visit there. The council's decision to create a police department was a response to the steady increase in visitors to a reservation casino that opened in August 1996. Nearly 8,000 people now visit the casino on a daily basis.

To provide more effective law enforcement on the reservation, the council determined that some of the tribe's police officers should apply to the federal government for commissions to be deputized to enforce federal law on the reservation. Such commissions are authorized by the federal Indian Law Enforcement Reform Act (ILERA). The council also determined that the officers should apply to the Mendocino County Sheriff's Department for peace-officer status under the California Penal Code so they could similarly enforce California criminal law. A sheriff of any county within California may deputize any federal or state law enforcement officer as a peace officer with the authority to enforce the provisions of the California Penal Code. See Cal.Penal Code § 830.6.

Traditionally, the enforcement of federal law on Indian lands has been a responsibility of the Bureau of Indian Affairs, an agency within the Department of the Interior. Under the ILERA, the BIA is authorized to delegate that responsibility to tribal police through a written contract and, once the contract is in place, through federal commissions called "special law enforcement commissions" or "SLECs" issued to individual tribal officers determined to be qualified on a case-by-case basis. The written contract is commonly referred to as a "deputation agreement." It sets forth the scope of the tribal police officers' authority under the SLECs and

the type of training, certification and security clearance the tribal officers must complete before they can be commissioned as federal agents. The BIA maintains a standard deputation agreement that can be modified on a case-by-case basis as necessary. The details of this statute and the implementing regulations will be set forth below.

In February 2003, Michael B. Meese, Chief of the Hopland Police Department, submitted applications for SLECs pursuant to the ILERA to the Sacramento office of the law enforcement division of the BIA for himself and two other tribal officers (Compl.¶ 21). The government concedes that it began the process of negotiating the necessary deputation agreement with the Hopland Band (Br.6). Chief Meese's applications were "approved" by the BIA's office of law enforcement services in Phoenix (Compl.¶ 22). That office prepared SLEC cards for the three tribal officers and sent them to Chief Meese. In March 2003, Chief Meese returned signed SLEC cards to the BIA's Phoenix office for affixing photos, lamination and subsequent return to the tribe (*id.* ¶ 23). The BIA, however, never returned the signed SLEC cards to the Hopland Band (*id.* ¶ 24).

Instead, the BIA informed the tribe that the Department of the Interior had placed a moratorium on the issuance of any further deputation agreements (*ibid.*). The department said it was reviewing the terms and conditions of its standard deputation agreement (*ibid.*). In June 2003, the Hopland Band, through counsel, requested that the Assistant Secretary of Indian Affairs provide "a waiver from the moratorium on issuing Special Law Enforcement Commissions" for Chief Meese and two other tribal police officers (*id.* ¶ 27). The request was denied in August 2003. The denial provided in relevant part (*id.* Exh. C):

The Federal Government has an interest in ensuring that Federal and federally commissioned officers are able to respond to calls immediately and with all of the necessary and recommended law enforcement tools. The BIA has determined that it is necessary to clarify the authority that SLEC Agreements confer on tribal law enforcement. Consequently, it is necessary to refine the model SLEC Agreement to make clear the BIA's intent and policy regarding law enforcement in Indian country throughout the United States. The BIA relies on these agreements to help provide effective law enforcement. Due to the importance of these agreements and the impact they have on numerous agencies, this clarification has involved an in-depth interagency effort. The BIA, in consultation with the Department of Justice, will finalize the model agreement as expeditiously as possible. No new agreements will be signed until that time.

In response, the Hopland Band invoked yet another federal statute, the Indian Self–Determination and Education Assistance Act (ISDEAA), often referred to as Public Law No. 93–638. It requires the Secretary of the Interior to enter into certain types of contracts aimed at enhancing tribal self-government. The Hopland Band prepared and submitted to the BIA a proposed contract under the ISDEAA (often called a "638 contract") for law enforcement services that "the BIA currently provides on Indian Reservations throughout the United States, including the State of California" (*id.* ¶ 29). The contract set forth the scope and criteria of the proposed program for law enforcement services, including the minimum standards the tribe's police officers would need to be commissioned as federal deputies, very much like the deputation contract contemplated under the ILERA (*id.* Exh. D).

In effect, the tribe sought to obtain the deputation agreement authorized by the ILERA as a "contractible" program under the ISDEAA. The programs or services subject to contract under the ISDEAA are listed below. Under the ISDEAA, the Secretary of the Interior is mandated to enter into contracts with tribal governments for law enforcement services (or other "contractible" service) unless the Secretary makes specific findings to justify rejecting the proposed contract.

In October 2003, defendant Dale Risling, Sr., Superintendent of the Central California Agency of the BIA, notified the Hopland Band that the BIA had rejected the tribe's 638 contract for law enforcement services. The BIA set forth three reasons to support its decision, specifically that: (i) deputation agreements and SLECs were not "programs, functions, services or activities" contractible under the ISDEAA; (ii) since California is a Public Law 280 state, the BIA did not provide law enforcement services to tribes within the state; and (iii) the Department of the Interior had placed a temporary nationwide moratorium on the issuance of deputation agreements preventing the BIA from concluding one with the tribe (*id.* Exh. E).

\* \* \* \* \* \*

In November 2003, the Hopland Band's police department investigated two crimes that occurred on the reservation and referred the complaints to the Mendocino County District Attorney for prosecution. The district attorney returned the two cases explaining (*id.* ¶ 32):

> ... [A] prosecutor's office can only accept referrals directly from a law enforcement agency employing policeman [sic] with official peace officer's status as defined under Penal Code section 832 et seq. Since your department does not yet fall under the Penal Code as an official police department we cannot accept referrals directly from you.

Although California Penal Code Section 830.6(b) authorizes a county sheriff to deputize a tribe's police officers as California peace officers, the sheriff's department in Mendocino County refused to so deputize the Hopland Band's police officers until the officers were issued SLECs and deputized by the federal government (*id.* ¶ 33). So, the tribe needs the federal deputation in order to be cross-deputized to enforce state law.

\* \* \* \* \* \*

Based on the foregoing, the Hopland Band filed this action in January 2004, asserting five claims. The tribe contends that the government violated the ISDEAA by declining to enter into its proposed 638 contract for law enforcement services (*id.* ¶¶ 41–42). According to the tribe, the decision unreasonably discriminated against the tribe and its members in violation of the Fifth Amendment to the United States Constitution (*id.* ¶ 37), was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. 701 et seq. (*id.* ¶ 47), constituted a breach of trust (*id.* ¶ 51), and resulted in a violation of Executive Order 13175 (*id.* ¶¶ 55–56).

### ANALYSIS

The Indian Self–Determination and Education Assistance Act was passed in 1975 for the purpose of allowing federally-recognized Indian tribes to contract with the government to take over certain federal services and programs that the government maintains and operates for the benefit of Indians and Indian tribes. *See* 25 U.S.C. 450a. The ISDEAA's stated goal was as follows (*id.* 450a(b)):

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the es-

tablishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

The ISDEAA was thus intended to promote a federal policy of tribal self-determination through self-government. Congress included the following mandatory contracting language in the ISDEAA (*id.* 450f(a)(1)):

(1) The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs—

(A) provided for in the [Johnson O'Malley] Act of April 16, 1934 (48 Stat. 596), as amended [25 U.S.C.A. § 452 et seq.] [which relate primarily to Indian education];

(B) which the Secretary is authorized to administer for the benefit of Indians under the [Snyder] Act of November 2, 1921 (42 Stat. 208) [25 U.S.C.A. § 13], and any Act subsequent thereto [which relate primarily to the general support and civilization of Indians, including Indian police];

(C) provided by the Secretary of Health and Human Services under the [Transfer] Act of August 5, 1954 (68 Stat. 674), as amended [42 U.S.C.A. § 2001 et seq.] [which relate to Indian health care];

(D) administered by the Secretary for the benefit of Indians for which appropriations are made to agencies other than the Department of Health and Human Services or the Department of the Interior; and

(E) for the benefit of Indians because of their status as Indians without regard to the agency or office of the Department of Health and Human Services or the Department of the Interior within which it is performed.

The ISDEAA defines a "self-determination contract" as a contract "entered into ... between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law ..." *Id.* 450b(j). Under the statute, those "programs or services" for which a tribe may propose a contract are "contractible." *See id.* 450f(a).[1]

Upon the request of any Indian tribe, therefore, the Secretary of the Interior is *mandated* by the ISDEAA to enter into a 638 contract for services or programs deemed contractible under the ISDEAA, unless one of five statutory exceptions applies. *Ibid.* The exceptions are set forth and discussed below. As shown, there are five categories of contractible services or programs called out by the statute, the second of which concerns the provision of a police force and related law enforcement functions on Indian lands. *Id.*

---

1. To describe those projects or services subject to contract under the ISDEAA, the statute uses the term "contract*able*." The term "contract*able*" means capable of being transmitted by infection. On the other hand, the term "contract*ible*" imports being subject to contract. This order will use the latter term.

450f(a)(1)(B). Congress thus recognized that one of the ways to further Indian self-determination was to allow a tribe to contract for law enforcement services so the tribe could maintain a tribal police force on the reservation capable of effectively enforcing criminal laws.[2]

The enforcement of federal criminal statutes (as opposed to state, tribal or local criminal statutes) on tribal lands has traditionally been the responsibility of the Department of the Interior's Bureau of Indian Affairs. This function was arguably performed without express statutory authority until 1990 when Congress provided the BIA with express authority under the Indian Law Enforcement Reform Act to enforce federal law on Indian lands. 25 U.S.C. 2802(a). Significantly, in carrying out this statutory responsibility, the BIA (in addition to maintaining its own police force) has been authorized to enter into deputation agreements with tribes to enforce federal law, maintain a qualified force and to deputize qualified tribal police officers to enforce federal law on Indian lands. Individuals receive such authority via a "special law enforcement commission" or "SLEC." To this end, the ILERA specifically provides that:

> The Secretary may enter into an agreement for the use (with or without reimbursement) of the personnel or facilities of a Federal, tribal, State, or other government agency to aid in the enforcement of carrying out in Indian country of a law of either the United States or an Indian tribe that has authorized the Secretary to enforce tribal laws.

*Id.* 2804. Once a deputation agreement is in place, a tribal police officer, if found on a case-by-case basis to be qualified, may be commissioned by the BIA, which would allow him or her to carry a firearm and make warrantless arrests, among other things. *Id.* 2803.

The principal issue presented here, on which there is no controlling caselaw, is whether the contractible programs, functions, services or activities under the ISDEAA comprehend the contracts to enforce federal law under the ILERA. This order holds that it does.

Significantly, the ILERA itself expressly contemplates such contracts will be available under the ISDEAA. Section 2805 of the ILERA provides:

> After consultation with the Attorney General of the United States, the Secretary may prescribe under this chapter regulations relating to the enforcement of criminal laws of the United States and regulations relating to the consideration of applications for contracts awarded under the Indian Self–Determination Act [25 U.S.C.A. § 450f et seq.] to perform the functions of the Branch of Criminal Investigations.

The purpose of the ILERA was to clarify and strengthen the authority of the law enforcement personnel and functions within the BIA for law enforcement activities. One of the ways Congress did that was to create a Branch of Criminal Investigations within the Division of Law Enforcement Services of the BIA. *Id.* 2802(d)(1). The Branch of Criminal Investigations was to be (and still is) "responsible for the investi-

---

**2.** Section 450f(a)(1)(B) refers to the Snyder Act, 25 U.S.C. 13, which provides (emphasis added):

The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:

*For the employment of* inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, *Indian police*, Indian judges, and other employees.

gation, and presentation for prosecution, of cases involving violations of sections 1152 [the Major Crimes Act] and 1153 [the General Crimes Act] of Title 18, within Indian Country." *Id.* 2802(d)(1)-(2).

The original House bill called for exempting the criminal investigative program created by the ILERA from the contracting provisions of the ISDEAA. When the ILERA was in committee before the House, the Committee on Interior and Insular Affairs recognized that "routine law enforcement and police operation in Indian country" could be and already were being carried out either directly or "under contract with the tribe." H.R.Rep. No. 101–60, 101st Cong., 1st Sess. 5–6 (1989). As for the "investigative" function, the House Report stated:

> The subsection also provides, in paragraph 2, that the investigative function of the Division, as opposed to the routine law enforcement function, would not be subject to contracting by an Indian tribe under Public Law 93–680. The Committee is reluctant to make this exception to the right of Indian tribes to contract for BIA programs on their reservations. However, investigative personnel operating under tribal supervision under a '638' contract might well lose their status as Federal law enforcement officials and, consequently, their investigative work product might well be rejected by U.S. Attorneys.

*Id.* at 6. Thus, the House bill would have exempted the "investigative" function but not routine police operation from the ISDEAA.

When the ILERA made its way to the Senate, however, even this exception from the ISDEAA was expressly eliminated. The Senate version of the ILERA:

> ... [E]liminate[d] the language which created an exemption for the Branch of Criminal Investigations from the provisions of the Indian Self–Determination

and Education Assistance Act and thereby prevented Indian tribes from contracting under Public Law 93–638. Instead the substitute provides under Section 6 that the Secretary may prescribe regulations related to the consideration of applications for contracts pursuant to Public Law 93–638 to perform the functions of the Branch of Criminal Investigations after consultation with the U.S. Attorney General. This change was supported by the testimony of tribal witnesses, the BIA, and representatives of the Department of Justice at the Committee's July 21st hearing on H.R. 498. Currently, there are several Indian tribes which have contracted for and are providing the Criminal Investigations function on their reservations. The Committee received testimony that several of these law enforcement programs have been run in an exemplary fashion. The Committee felt strongly that the Federal Government's policy of Indian Self–Determination should be maintained and Indian tribes should be allowed and encouraged to pursue these policy objectives.

S. Rep. 101–167, 101st Sess. 6 (1989).

As a result, as finally enacted, the ILERA expressly provides that tribes can contract for this "investigative" function by proposing a 638 contract for the program under the ISDEAA. Section 2802(d)(4)(i) provides in relevant part:

> ... Nothing in this paragraph is intended to prohibit cooperation, coordination, or consultation, as appropriate, with nonlaw enforcement Bureau of Indian Affairs personnel at the agency or area levels, or prohibit or restrict the right of a tribe to contract the investigative program under the authority of Public Law 93–638 or to maintain its own criminal investigative operations.

It is worth repeating that Section 2805 also provides:

> After consultation with the Attorney General of the United States, the Secretary may prescribe under this chapter regulations relating to the enforcement of criminal laws of the United States and regulations relating to the consideration of applications for contracts awarded under the Indian Self–Determination Act [25 U.S.C.A. § 450f et seq.] to perform the functions of the Branch of Criminal Investigations.

The ability to contract under the ISDEAA for this investigative program is significant. It demonstrates that Congress' fundamental objective in passing the ISDEAA and the ILERA was to promote Indian self-determination and to allow Indian tribes to contract for those law enforcement services and programs that would better enable the tribes to enforce criminal laws, including federal criminal laws, on Indian lands. This does not mean, of course, that any and all tribal officers are entitled to federal commissions. Such applicants would still have to be found qualified (or not) by the BIA on a case-by-case basis. It is a two-step process. First, the contract must be agreed upon. Then, individual tribal peace officers must be evaluated on a case-by-case basis.

Based on the foregoing, this order finds that those law enforcement services or programs established by the ILERA come within contracts for law enforcement services or programs under the ISDEAA. The clear intent of Congress in both enactments was to further the self-determination of Indian tribes. This necessarily includes giving the tribes the power to adequately enforce federal law and investigate violations thereof. If the Secretary (through the BIA) refuses to enter into such a contract, the Secretary may do so only on one of the five statutory grounds provided by the ISDEAA.

The government disagrees. Its primary argument is that the ILERA and its implementing regulations give the BIA discretion as to when to enter into deputation agreements and issue SLECs. According to the government, to interpret the ILERA in a manner that would require that it enter into deputation agreements under the ISDEAA would contravene the language of the ILERA. This order rejects the contention.

Under the ILERA, the BIA, as authorized by the Secretary, can hire its own police officers and maintain its own police force to enforce federal law on Indian lands. The ILERA further provides that the BIA, in its discretion, may seek assistance from other federal, state, local or tribal agencies to fulfill its responsibilities. Under Section 2804(a) (emphasis added):

> The Secretary *may* enter into an agreement for the use (with or without reimbursement) of the personnel or facilities of a Federal, tribal, State, or other government agency to aid in the enforcement of carrying out in Indian country of a law of either the United States or an Indian tribe that has authorized the Secretary to enforce tribal laws. The Secretary *may* authorize a law enforcement officer of such an agency to perform any activity the Secretary *may* authorize under section 2803 of this title.

The word "may" in the ILERA, however, simply authorizes the Secretary to enter into the contracts at issue. Once the Secretary is authorized to do so, the ISDEAA (as even the ILERA envisions) requires the Secretary to contract with a tribe so requesting unless one of the statutory exceptions is shown.

The government alternatively contends that *Navajo Nation v. Dep't of Health and Human Services*, 325 F.3d 1133 (9th Cir. 2003), supports its position that such services are simply not subject to contract

under the ISDEAA. That decision is distinguishable. The issue there was whether an Indian tribe could contract under the ISDEAA for welfare funds under a grant program known as Temporary Assistance for Needy Families (TANF), which shifted the administration of welfare-benefit programs almost entirely from the federal government to the states. The tribe claimed that TANF was a program "for the benefit of Indians because of their status as Indians" and hence was a contractible program under Section 450(a)(1)(E). *Navajo Nation*, 325 F.3d at 1136. The Ninth Circuit disagreed and held that a grant of TANF funds was not contractible under the ISDEAA because the welfare program had not been previously administered by the government and subsequently transferred to the tribe. *Id.* at 1135. The court noted that 638 contracts under the ISDEAA were intended to cover contracts for services "that the federal government otherwise would have provided directly," and the welfare reform block grants "did not provide any such direct services." *Id.* at 1139.

The opposite is true in this case, however. The BIA is in charge of enforcing federal criminal statutes on tribal lands. The BIA provides this law enforcement service directly unless it transfers the authority to do so to someone else. Through proposed 638 contracts for law enforcement services, including negotiated deputation agreements and the issuance of SLECs under the ILERA, the BIA can transfer its law enforcement responsibilities to Indian tribes. As mentioned, the purpose of the ISDEAA was to transition control of federally-administered services for Indians from the government to Indian tribes. The ILERA expressly contemplates that such contracts are contractible under the ISDEAA.

Therefore, the Secretary in the present case was required to negotiate a 638 contract for law enforcement services with the tribe unless a statutory exception justified not doing so. Under the ISDEAA, the Secretary can reject a proposed 638 contract if the Secretary makes one of five specific findings as follows (25 U.S.C. 450f(a)(2)):

(A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(B) adequate protection of trust resources is not assured;

(C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract . . .; or

(E) the program, function, service or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services or activities covered under paragraph (1) because the proposal includes activities that cannot be lawfully carried out by the contractor.

The tribe's proposed contract for law enforcement services was rejected for different reasons, namely: (i) deputation agreements and SLECs were not "programs, functions, services or activities" contractible under the ISDEAA via a 638 contract; (ii) since California is a Public Law 280 state, the BIA did not provide law enforcement services to tribes within the state; and (iii) the Secretary of the Interior had placed a nationwide moratorium on the issuance of deputation agreements (Compl.Exh. E). This order rejects each of these alleged grounds.

The first basis for rejecting the tribe's 638 contract was that deputation agreements and SLECs were not "programs, functions, services or activities" contracti-

ble under the ISDEAA. This order has already held above that such agreements under the ILERA are contractible under the ISDEAA. Moreover, as shown in the footnote, the record indicates that in fact SLECs have regularly been issued pursuant to ISDEAA contracts.[3]

The government also rejected the tribe's proposed 638 contract on the ground that it did not provide law enforcement services in California because California is a Public Law 280 state. The purpose of Public Law 280 was "to relinquish federal jurisdiction over Indian people residing on reservations as quickly as possible." *Confederated Bands and Tribes of the Yakima Indian Nation v. State of Washington,* 550 F.2d 443, 446 (9th Cir.1977). Accordingly, Public Law 280 granted states like California the exclusive jurisdiction to enforce their criminal laws on Indian lands to the same degree as elsewhere in the state. 18 U.S.C. 1182(a). The result was that the federal government through Public Law 280 ceded its authority to enforce certain federal criminal statutes, *e.g.,* the Major Crimes Act, General Crimes Act and Assimilative Crimes Act, on Indian lands in certain states. 18 U.S.C. 7(3), 1162(c).

The government would now have this mean that it has *no* authority to enforce federal law on Indian lands in California. It appears the opposite is true, however. At a training seminar in July 2003, the BIA distributed a memorandum dated November 9, 2000, prepared by the Office of Tribal Justice, a division of the United States Department of Justice, that contained the following statement regarding the government's authority to exercise criminal jurisdiction in Public Law 280 states like California:

Aside from tribal authority, it is also clear that the federal government retains substantial law enforcement authority in Indian country in P.L. 280 states. Federal criminal laws of general application continue to play in Indian country areas that are subject to P.L. 280. *See United States v. Pemberton,* 121 F.3d 1157, 1164 (8th Cir.1997) (federal mail fraud and conspiracy offenses apply n P.L. 280 states). That includes the offenses—other than sections 1152 and 1153—that are designed to protect Indian lands or Indian commerce that are set forth in Chapter 53 of Title 18. *See Rice v. Rehner, supra* (applying the delegation to regulate Indian country liquor transactions in 18 U.S.C. § 1161 to California); *United States v. Guassac,* 169 F.3d 1188 (9th Cir.1999) (offense of theft from a tribal organization defined in 18 U.S.C. § 1163 applies in California); *United States v. Pollmann,* 364 F.Supp. 995 (D.Mont.1973) (offense of unlawful hunting on Indian lands defined in 18 U.S.C. § 1165 applies in P.L. 280 state). Violations of federal criminal laws are investigated by the Federal law enforcement agencies that generally have responsibility over them. That includes the BIA, which generally has authority to enforce federal laws in Indian country. *See* 25 U.S.C. § 2806(a). The BIA also has authority to commission

---

**3.** In a declaration, the chairman of the Chemehuevi Indian Tribe, which maintains a reservation entirely within the County of San Bernardino in California, stated:

From 1976 until the year 2000, the Tribe had applied for, and the United States Department of Interior, Bureau of Indian Affairs, had approved, a "638 Contract" for the Tribe for wildlife and law enforcement services on the Chemehuevi Indian Reservation, pursuant to the Indian Self Determination and Educational Assistance Act, 25 U.S.C. § 450, et al. Under that 638 Contract, the Bureau of Indian Affairs issued special law enforcement commissions to the Tribe's tribal conservation officers, authorizing the Tribe's tribal conservation officials to enforce various federal laws on the Chemehuevi Indian Reservation.

(Smith Decl. ¶ 4).

tribal police officers as "special law enforcement officers" of the BIA to carry out those responsibilities and to contract out its functions under either the Indian Self–Determination and Education Assistance Act, 25 U.S.C. § 450 et seq., or the Self–Governance Program, 25 U.S.C. § 458aa et seq.

(Meese Decl. Exh. D). This excerpt completely rebuts counsel's *ipse dixit* contention here that California's status as a Public Law 280 state entirely voids the government's jurisdiction to enforce federal law on California tribal lands.

Finally, the placement of a "nationwide moratorium" on the issuance of law enforcement contracts is not a statutory ground for rejecting a 638 contract proposal. That ends the inquiry as to that particular issue. This order, however, further questions the sweeping nature of the subject moratorium. The wholesale moratorium was put into place in response to a narrow decision in the United States District Court for the Central District of California in a lawsuit between the Cabazon Band of Mission Indians and the State of California. *See Cabazon Band of Mission Indians v. Smith,* 2002 WL 32065673 (C.D.Cal.2002). As explained in the footnote, it is hard to see how the limited ruling in *Cabazon Band* could have reasonably warranted so expansive and so indefinite a moratorium as the BIA has now put into place.[4] And, one must also question whether the moratorium itself constitutes a repeal of its own SLEC regulations, *i.e.,*

new rulemaking that should have been carried out (but was not) via public comment and formal rulemaking in violation of the Administrative Procedure Act. *See CropLife America v. EPA,* 329 F.3d 876, 884 (D.C.Cir.2003).

\*   \*   \*   \*   \*   \*

Since the Secretary did not deny the proposed contract on a valid statutory ground, it follows that the Secretary, through the BIA, should have proceeded to negotiate an acceptable contract. Since the Secretary acted under a mistake of law, however, the Court will allow the Secretary a four-week period (until July 30, 2004) to determine whether any of the statutory grounds for a denial exist. In the meantime, the motion to dismiss must be denied. If the four-week period passes without any relief, the action will proceed without further order into discovery and eventually the summary judgment stage, even trial if need be.

Once the contract for law enforcement services is in place, if ever, the individual officers at issue can be assessed by the BIA on a case-by-case basis under the BIA's regulations (25 C.F.R. 12.21) to determine whether they qualify for SLECs. If any are denied commissions, judicial review will be available under the Administrative Procedure Act.

\*   \*   \*   \*   \*   \*

Since this order holds that the tribe has stated a claim under the ISDEAA as well as the ILERA, it is unnecessary to reach

---

4. The litigation in *Cabazon Band* involved whether the tribe's police officers, who had been issued SLECs pursuant to a deputation agreement with the BIA, were authorized to drive their police cars with emergency light bars on California highways that connected various parts of the Cabazon Band's reservation. Under California law, only "authorized emergency vehicles" could operate with such light bars. The Cabazon Band argued that its deputation agreement, which incorporated a

BIA law enforcement policy that required that its police vehicles be equipped with operational emergency light bars, preempted state law. The district court disagreed and held that the Cabazon Band's deputized police officers were not exempt from the state law. *Cabazon Band,* 2002 WL 32065673, at \*7–8. The Cabazon Band's appeal from the district court's decision is now pending appeal in the Ninth Circuit.

the rest of the other grounds for relief asserted by the tribe in its complaint. This portion of the motion to dismiss is DENIED AS MOOT without prejudice to subsequent review if the other claims ever become important.

## CONCLUSION

For the reasons stated, the government's motion to dismiss is DENIED.

**IT IS SO ORDERED.**