MINER ELECTRIC, INC., and Russell E. Miner, Plaintiffs,

v.

MUSCOGEE (CREEK) NATION, Defendants.

No. 05–CV–359–HDC–PJC.

United States District Court, N.D. Oklahoma.

Oct. 10, 2006.

Tony Michael Graham, William Francis Smith, Graham & Freeman PLLC, Tulsa, OK, for Plaintiffs.

Shannon Bears Cozzoni, Muscogee (Creek) Nation Attorney General's Office, Shannon Lee Prescott, Muscogee (Creek) Nation Dept of Justice, Okmulgee, OK, for Defendants.

## *ORDER*

H. DALE COOK, District Judge.

The Court has before it a motion for summary judgment filed by the plaintiffs Miner Electric, Inc. and Russell E. Miner [Dkt.# 30]. Plaintiffs ("Miner") rely on the stipulated facts set forth by the parties in their Joint Status Report filed with this Court on February 2, 2006, to contend that they are entitled to summary judgment as a matter of law on their claim for declaratory and injunctive relief.

### Scope of Review

In its response pleading, the defendant Muscogee (Creek) Nation ("MCN") asserts the Court should deny plaintiffs' motion for summary judgment by contending that there are controverted facts which would require a trial of the case on the merits. MCN states that although it admits the validity of the stipulated facts, it contends that there are additional facts in controversy which should defeat Miner's claim

for summary judgment. As to the controverted facts, MCN contends that it can show at trial that (1) Russell Miner confirmed the substance found in the Hummer was methamphetamine and provided further information about the existence of other drugs and possibly a firearm in the Hummer, (2) that Russell Miner's and Ricky Miner's testimonies are not credible, (3) Russell Miner possessed or was involved in illegal drug activities, (4) the amount of methamphetamine located in the Hummer was more than that for personal use, and (5) the Hummer was used as a safe haven in which to ingest the illegal substance. The MCN contends that the Court should deny plaintiffs' motion for summary judgment because "[s]ummary judgment is not proper if observation of the demeanor of the witnesses is necessary to establish the credibility of their testimony."

■ The Court finds no merit to MCN's objections to Miner's reliance on stipulated facts to support their claim for summary judgment. This Court is without authority to sit in review of the merits of the factual findings entered by the tribal court or the credibility of the evidence presented. Congress has limited federal court review of such actions to a determination whether the tribal court had jurisdiction over the non-Indian and/or his property. Federal courts do not inquire into whether the tribal court correctly applied tribal law. Federal courts are limited to a jurisdictional review. In *National Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) a tribal court entered a default judgment against a non-Indian insurance company resulting from an accident which occurred on Indian land. The insurance company filed for a preliminary injunction in federal court, claiming that the tribe lacked authority to enter a civil judgment against the non-Indian company. The Supreme Court, in affirming the district court's issuance of the injunction, held that the district court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction. *Id.* 852, 105 S.Ct. 2447. Thus, the Court finds that the stipulated facts relied upon by plaintiffs in support of their motion, are the relevant facts for this Court to determine whether the MCN tribal court had the jurisdictional power to bring a civil forfeiture proceeding against a non-Indian for a crime committed on Indian land.

### Stipulated Material Facts

In the Joint Status Report filed with the Court on February 2, 2006, the parties stipulated to the following material facts:

1. On June 16, 2004, the Muscogee (Creek) Nation ("MCN") operated a casino located near 81st and Riverside Drive, Tulsa, Oklahoma, known as the Mackey Site.

2. The Mackey site is within the territorial jurisdiction of the MCN and is Indian Country as defined by 18 U.S.C. § 1151.

3. On June 15, 2004, the plaintiff Russell E. Miner and his brother Ricky Dean Miner arrived at the casino and did not leave until June 16, 2004.

4. Miner Electric, Inc., Russell E. Miner and Ricky Dean Miner are non-Indians.

5. Plaintiff Russell E. Miner and his brother arrived at the casino in a 2004 General Motors Hummer H2, VIN 5GRGN23U6H116688.

6. The Hummer H2 is owned by plaintiff, Miner Electric, Inc.

7. The Hummer was purchased by Miner Electric, Inc. on April 4, 2004.

8. The purchase price of the Hummer was approximately $55,000.

9. Miner Electric, Inc. is a corporation, incorporated under the laws of the State of Oklahoma on April 2, 1987.

10. Plaintiff Russell E. Miner is the President, Chief Executive Officer and a shareholder of Miner Electric, Inc.

11. On or about June 16, 2004, a security officer at the casino observed the subject vehicle parked in a handicapped parking space. On inspection of the vehicle, the officer determined that a handicapped parking decal was not visible.

12. The officer observed a white powder inside the vehicle. He notified his supervisor who, in turn, notified the Muscogee (Creek) Lighthorse Police.

13. Entry into the vehicle was gained with the consent of Russell E. Miner.

14. A search of the vehicle resulted in the seizure of the white powder, cash in the amount of one thousand four hundred sixty-three dollars and fourteen cents ($1,463.14), a day planner-notebook and the subject vehicle.

15. Russell E. Miner was issued a civil citation by the Lighthorse Police Officer which read: "Disorderly Conduct: Possession of Controlled Dangerous substance."

16. Russell E. Miner appeared in the MCN District Court on June 30, 2004, in response and pursuant to the civil citation, cause number TR 2004–118. Russell Miner entered a plea of guilty to the civil citation of disorderly conduct and was assessed a civil fine of two hundred and fifty dollars ($250.00) and costs of eighty-four dollars ($84.00) for a total of three hundred thirty-four dollars ($334.00). The fine and costs were paid on that day. Russell E. Miner was not represented by an attorney before or during these proceedings.

17. The MCN instituted a civil forfeiture proceeding, on June 30, 2004, in the MCN District Court, case number CV–2004–10, seeking forfeiture of the cash, the subject vehicle and drugs found in the vehicle after the conclusion of the civil proceeding for disorderly conduct against Russell E. Miner.

18. The parties stipulated in the civil forfeiture proceeding that the white powder found in the Hummer was 6.8 grams of methamphetamine. Miner Electric, Inc. and Russell E. Miner intervened in that action. Miner Electric, Inc. asserted ownership of the Hummer and Russell E. Miner asserted ownership of the cash and day planner seized by the Muscogee (Creek) Lighthorse Police.

19. An evidentiary hearing in forfeiture proceeding was held by the MCN District Court on August 27, 2004.

20. On January 10, 2005, the MCN District Court entered an order setting forth findings of fact and conclusions of law. The court ordered forfeiture of the 2004 Hummer 2, cash and a day planner found inside the vehicle.

21. The order of the MCN District Court was appealed to the MCN Supreme Court, case number SC–2005–01.

22. The Supreme Court of the MCN affirmed the order of forfeiture in its decision filed on April 29, 2005.

23. A petition for rehearing was timely filed with the MCN Supreme Court by Miner Electric, Inc. and Russell E. Miner.

24. The petition for rehearing was denied by the MCN Supreme Court on June 22, 2005.

25. The MCN District Court has stayed the forfeiture proceedings pending resolution of this action before this Court.

26. All tribal remedies have been exhausted by Miner Electric, Inc. and Russell Miner.

27. Miner Electric, Inc. and Russell E. Miner, asserted as defenses, and disputed and denied by MCN in the forfeiture proceeding in the MCN District and Supreme

Courts, that MCN does not have jurisdiction over Miner Electric, Inc. and Russell E. Miner as they are not Indians; mere possession of an illegal drug does not trigger forfeiture; that there was no evidence that Miner Electric, Inc. was involved in any illegal activity; that forfeiture in this case violates the Excessive Fines Clause of the Eight Amendment to the United States Constitution; that Miner Electric, Inc. and Russell E. Miner are not Indians and therefore not subject to jurisdiction of the MCN; and, that forfeiture violates the Indian Civil Rights Act, 25 U.S.C. § 1301 et. seq.

28. Ricky Dean Miner is the brother of Russell E. Miner.

29. Ricky Dean Miner is not an officer, director, shareholder, employee or otherwise associated with Miner Electric, Inc.

30. Ricky Dean Miner has admitted in the MCN District Court forfeiture proceedings that he had possessed the illegal drugs and had placed the drugs inside the Hummer on June 15 or 16, 2004.

31. Ricky Dean Miner has admitted in the MCN District Court forfeiture proceedings that he and another person, not Russell E. Miner, had ingested drugs inside the Hummer on June 15 or 16, 2004 while it was located at the MCN casino.

### Issue Raised

MCN relies exclusively on the holding in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) as authority to compel a non-Indian property owner to submit to the civil forfeiture jurisdiction of its tribal court. In *Montana,* the Supreme Court stated:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations ... A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565–6, 101 S.Ct. 1245.

MCN contends that under the authority of *Montana,* the tribal court has jurisdiction to issue civil forfeiture of property owned by non-Indians who possess illegal drugs because illegal drugs affect the health and welfare of the Indian tribe. Without such civil jurisdiction, MCN contends that it would be unable "to protect not only its citizens but also the patrons of its businesses, both Indian and non-Indian." As alternative grounds for exercise of tribal court jurisdiction, citing Montana, the MCN contends that by Miner voluntarily entering on tribal land as a patron of an Indian casino, a commercial enterprise, he impliedly consented to the tribes "regulatory authority" and tribal laws. Again citing *Montana,* the MCN rationalizes that if the tribe is unable to protect its patrons, patrons may choose to visit other non-tribal businesses which could affect the MCN's economic security and the future of its citizens. Finally, MCN asserts that without a method to control illegal drugs on Indian land, the MCN's political integrity could be compromised from potential lawsuits and liability for its failure to take action against illegal drug activities.

### Applicable Law

"The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law."

*National Farmers Union Ins. v. Crow Tribe of Indians,* 471 U.S. at 852, 105 S.Ct. 2447.

### Status of Indians—Source of Authority Over Non–Indians

In determining whether an Indian tribe has authority to exercise jurisdiction over a non-Indian, the Court must first determine whether such authority is authorized by Congress or by treaty. In relying on *Montana,* the MCN does not contend that its action stems from a grant of congressional authorization or by treaty. And, indeed the Court finds there is no express authorization for the tribal court actions herein. Accordingly, the Court must determine whether the MCN retains inherent authority to exercise in rem jurisdiction to seize and forfeit property of a non-Indian for violations of its civil ordinance regulating traffic and public safety.

In *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Supreme Court held that Indian tribal courts do not have inherent criminal jurisdiction to try and to punish non-Indians, and may not assume criminal jurisdiction unless specifically authorized to do so by Congress. *Id.* at 195, 98 S.Ct. 1011.

In *Montana,* the Supreme Court limited a tribal court's exercise of civil jurisdiction over non-Indians. The *Montana* court emphasized a tribal court's limited authority over non-Indians in:

Stressing that Indian tribes cannot exercise power inconsistent with their diminished status as sovereigns, the Court quoted Justice Johnson's words in his concurrence in *Fletcher v. Peck,*—the first Indian case to reach this Court that the Indian tribes have lost any 'right of governing every person within their limits except themselves.' Though *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the gen-

eral proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.

*Id.* at 565, 101 S.Ct. 1245 (internal citations omitted).

■ After reiterating this general rule of law, the Supreme Court in *Montana* set forth the limited exceptions when tribal courts may exercise civil jurisdiction over non-Indians engaged in activities on Indian land. "The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that *directly* affects the tribe's political integrity, economic security, health or welfare." See *Strate v. A–1 Contractors,* 520 U.S. 438, 446, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), citing *Montana,* 450 U.S. at 555, 101 S.Ct. 1245 (emphasis added). The Supreme Court consistently applies a presumption of nontribal authority over non-Indians and their property. For example, in *South Dakota v. Bourland,* 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) the Supreme Court explained that the general principle of "inherent sovereignty" does not enable an Indian tribe to punish non-Indians. "Although Indian tribes retain inherent authority to punish members who violate tribal law, to regulate tribal membership, and to conduct internal tribal relations (citation omitted), the 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" *Id.* at 694, 113 S.Ct. 2309, citing *Montana,* 450 U.S. at 564, 101 S.Ct. 1245. In *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), referring to a tribe's dependent status, the Supreme Court held that absent express Congressional authority or treaty, tribal

courts do not have civil jurisdiction to adjudicate claims brought by an Indian under 42 U.S.C. § 1983 against a non-Indian for alleged tortious conduct occurring on Indian land. *Id.* at 374, 121 S.Ct. 2304.

■ The MCN cites no authority for its broad extension of the limited exceptions set forth in *Montana* to grant tribal court civil forfeiture jurisdiction over property owned by non-Indians. The limited application of these exceptions was specifically addressed by the Supreme Court in *Strate* by stating, "Our case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." 520 U.S. at 445, 117 S.Ct. 1404. "In the main, the Court explained, 'the inherent sovereign powers of an Indian tribe'-those powers a tribe enjoys apart from express provision by treaty or statute—'do not extend to the activities of nonmembers of the tribe.'" *Id.* at 445-6, 117 S.Ct. 1404, citing *Montana,* 450 U.S. at 565, 101 S.Ct. 1245. In *Montana* the Supreme Court cited specific cases to illustrate instances in which tribal courts may exercise civil jurisdiction over non-Indians, absent an express grant of Congressional authority. The *Montana* court cited *Washington v. Confederated Tribes of Colville Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) as illustrative of the first *Montana* exception applicable to nonmembers who enter consensual relationships with the tribe or its members. The court in *Colville* recognized inherent tribal authority to *tax* non-Indians who enter Indian land to engage in economic activities. See *Strate,* 520 U.S. at 452, 117 S.Ct. 1404. The Court finds that a tribe's inherent authority to *tax* non-Indians who own (and operate for profit) commercial establishments on Indian land, does not extend to inherent authority to *forfeit* property of non-Indian *invitees* who are merely patrons of Tribal owned and operated gaming facilities.

The *Montana* court cited *Fisher v. District Court of Sixteenth Judicial Dist.,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) as illustrative of the second *Montana* exception, covering activities of non-Indians on Indian land which directly affect the "political integrity, the economic security, or health or welfare of the tribe." In Fisher, the Supreme Court held that a tribal court had exclusive jurisdiction over an *adoption* proceeding when all the parties were members of the tribe and resided on the reservation. See *Strate,* 520 U.S. at 452, 117 S.Ct. 1404. The Supreme Court explained that any such state court interference with a tribal court's power over Indian adoptions would *directly* interfere with the a tribe's right to self government. See *Strate,* 520 U.S. at 452, 117 S.Ct. 1404, citing Fisher, 424 U.S. at 387, 96 S.Ct. 943. The *Strate* court concluded, by holding:

> As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction. Absent congressional direction enlarging tribal-court jurisdiction, we adhere to that understanding. Subject to controlling provisions in treaties and statutes, and to the two exceptions identified in Montana, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally 'do[es] not extend to the activities of nonmembers of the tribe.'

*Id.* at 455, 117 S.Ct. 1404, citing *Montana,* 450 U.S. at 565, 101 S.Ct. 1245.

In *Nevada v. Hicks,* the Supreme Court, citing *Strate,* reiterated the limitation of its holding in *Montana:*

> In *Strate,* we explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which *Montana* referred: tribes have the authority '[to punish tribal offenders,] to determine

tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.' These examples show, we said, that Indians have 'the right ... to make their own laws and be ruled by them.'... Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them. [For example], ('The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government,' at least as to 'tribal lands' on which the tribe 'has ... authority over a nonmember').

533 U.S. at 360–1, 121 S.Ct. 2304 (internal citations omitted).

■ The Court finds that a tribe's inherent authority to *regulate* internal affairs which *directly* impact the Tribe's "political integrity, economic security, or health or welfare" does not extend to an inherent authority to *forfeit* property of a non-Indian for infringement of a Tribe's internal civil code which regulates traffic and public safety among its people.

### Civil Forfeiture Proceeding—Quasi Criminal In Character

■ Civil forfeiture is quasi-criminal in character. *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). The Supreme Court in *Plymouth Sedan* restated its prior holding, "We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal." 380 U.S. at 697, 85 S.Ct. 1246, citing *Boyd v.*

*United States,* 116 U.S. 616, 633–4, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The Supreme Court relied on the fact that "forfeiture is clearly a penalty for the criminal offense." *Id.* at 701, 6 S.Ct. 524. "Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *Id.* at 700, 6 S.Ct. 524.

■ From a review of the findings entered by the MCN tribal court and the Opinion issued by the MCN Supreme Court, it is clear that civil forfeiture in this case, as in *Boyd* and *Plymouth Sedan,* was used "for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him" and "its object, like a criminal proceeding, [wa]s to penalize for the commission of an offense against the law." The MCN Supreme Court affirmed the tribal court's findings that Miner was involved in illegal drug distribution.[1] The MCN argues herein that under *Montana* it has inherent authority to issue civil forfeiture against the property of a non-Indian because illegal drug distribution has a direct affect on the political integrity, the economic security, or the health or welfare of the tribe. In other words, the MCN argues it invoked civil jurisdiction over Miner's property for the protection of its people and for the public good. However, the aim of criminal law "is to protect the public against harm, by punishing harmful results of conduct or at least situations (not yet resulting in actual harm) which are likely to result in harm if allowed to proceed further."[2] The function of civil law is to compensate a private person who is injured for the harm he has suffered. *Id.* Although Miner was lured into tribal court on the pretense of a

---

1. The tribal court found, and the MCN Supreme Court affirmed, that the amount of methamphetamine located in the Hummer 2, 6.80 grams, was not "a user amount" but was evidence of illegal drug distribution. Meth-

amphetamine is an illegal drug as defined in the MCN Criminal Code, Title 14, 2–101(I).

2. LaFave and Scott, *Criminal Law Handbook,* 11, West Publishing (1977).

"civil" traffic citation for "Disorderly Conduct," it is the admitted objective of the MCN to use its limited civil jurisdiction to eradicate criminal conduct. Although it is arguably a worthy cause, the MCN is without authority to act in this regard under the express holding of *Oliphant*. Accordingly, the Court finds that MCN is without authority to assume civil forfeiture jurisdiction over the property of a non-Indian in order to punish the non-Indian for the commission of a clearly criminal act on Indian land.

A further indication denoting MCN's improper attempt to assume criminal jurisdiction over non-Indians and their property is the admitted disparate application of tribal laws toward Indians and non-Indians. According to the Opinion issued by the MCN Supreme Court, if Miner was an Indian his conduct would have resulted in a criminal charge under Title 14 of the MCN's criminal code and subjected Miner to imprisonment and criminal fines up to $5,000. Miner's conduct, if he was an Indian, would be classified as a felony under 14 Muscogee (Creek) Nation Code Ann § 2–701–705. However, because Miner is a non-Indian the felony offense does not apply to him. To bring Miner to justice and punish his criminal conduct, the MCN attached and forfeited his property as a "civil infraction" of the MCN traffic and safety code. The Court finds that the MCN cannot characterize a criminal offense as a civil infraction in order to assume jurisdiction over a non-Indian and his property when it would otherwise not have jurisdiction if the offense was properly characterized. That is to say, the tribal court cannot indirectly assume jurisdiction over a person or property which it would not otherwise have direct jurisdiction if the offense committed was properly character-

ized. In recognizing that Indians do not retain the inherent authority to try non-Indians according to the tribes own customs and procedures, the Supreme Court in *Oliphant* said:

> Congress extended the jurisdiction of federal courts, in the Trade and Intercourse Act of 1790, to offenses committed by non-Indians against Indians within Indian Country. In so doing, Congress was careful to extend to the non-Indian offender the basic criminal rights that would attach in non-Indian related cases. Under respondents' theory, however, Indian tribes would have been free to try the same non-Indians without these careful proceedings unless Congress affirmatively legislated to the contrary. Such an exercise of jurisdiction over non-Indian citizens of the United States would belie the tribes' forfeiture of full sovereignty in return for the protection of the United States.

435 U.S. at 211, 98 S.Ct. 1011.

### Civil Forfeiture—Requires Congressional Authorization

There is no federal statute which confers on tribal courts the authority to forfeit to the tribe vehicles, cash, or other personal property from non-Indians who possess or distribute controlled illegal substances on Indian land. Only Congress has the power to invest that authority on tribal courts. *Oliphant* is the recognition that Indian tribes do not have the power, nor do they have the authority to regulate non-Indians unless so granted by an act of Congress.

 Civil forfeiture is a major weapon in federal law enforcement.[3] The power to issue forfeiture must be created by statute. "Congress has enacted over 100 civil forfeiture statutes that empower the

---

**3.** Lawrence Kasten, *Extending Constitutional Protections to Civil Forfeiture That Exceed Rough Remedial Compensation*, 60 Geo. Wash.L.Rev. 194 (1991), citing U.S. Department of Justice, *Asset, Forfeiture: Compilation of Civil Statutes* 1 (1987).

federal government to seize and forfeit personal assets and real property that are traceable to, or have facilitated, certain criminal activities."[4] Congress must authorize the forfeiture by describing both the conduct required for forfeiture, and the property subject to forfeiture.[5] The fiction of in rem forfeiture, that is, the property facilitated the crime, was developed primarily to expand the reach of the courts. *Republic Nat. Bank of Miami v. United States,* 506 U.S. 80, 87, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992). It follows therefore, that any expansion of a tribal court's exercise of jurisdiction over non-Indians can only be empowered by Congress. Because Indian tribes are "domestic dependent nations" they lack jurisdiction to seek civil forfeiture over property of non-Indian for illegal or criminal conduct occurring on Indian land absent express Congressional authorization.

█ Congress has plenary power over Indian affairs. *Worcester v. Georgia,* 31 U.S. 515, 561, 6 Pet. 515, 8 L.Ed. 483 (1832). Federal in rem forfeiture is a legal process, authorized by Congress, whereby the government brings a civil action to acquire property that is connected to a crime. See Title 21 United States Code, Section 881. Because Indian tribes do not have criminal jurisdiction over non-Indians, civil forfeiture (which in this instance was based upon criminal conduct) is not available to Indian tribes absent express authority from Congress.

At least in one instance, Congress has expressly authorized civil forfeiture by Indian tribes for illegal activities occurring on Indian land. Federal statutory law provides for the civil forfeiture of any fish and wildlife taken in violation of tribal ordinances, and for the forfeiture of the vehicles and equipment used to take the fish and wildlife. See Title 16 United States Code, Section 3371–3378. These provisions may be enforced by federal officials, or the Secretary of Interior may authorize tribal personnel to enforce these provisions. See Title 16 United States Code, Section 3375(a)-(b) (1994). Under this statutory scheme, forfeiture is to the federal government, not to the tribal nation. *Oliphant* reinforced that sovereign powers of Indian tribes are necessarily subordinate to those of the federal government. "Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty." 435 U.S. at 209, 98 S.Ct. 1011. Accordingly, any forfeiture would necessarily perfect title to the forfeited property in the federal government. The Court finds that Congress has not delegated to Indian tribes the power to adopt civil forfeiture provisions against non-Indians, and therefore any attempt by the tribe to enforce those laws against non-Indians and their property is beyond the jurisdictional reach of the tribal courts.

### Eight Amendment—Violation of the Excessive Fines Clause

The Supreme Court held in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) that civil forfeiture under the federal statutes relating to drug offenses, Title 21 United States

---

**4.** *Id.* at 194–5, 98 S.Ct. 1011. "The United States Department of Justice estimated that more than $600 million in personal assets and real property were forfeited to the federal government in 1989 alone." *Id.* at 193 n. 2, 98 S.Ct. 1011 citing The Department of Justice, *Federal Forfeiture of the Instruments and* *Proceeds of Crime, The Program in a Nutshell* 1–2 (1990).

**5.** *Id.* at 193 n. 3, 98 S.Ct. 1011 citing e.g. *United States v. Lane Motor Co.,* 199 F.2d 495 (10th Cir.1952), aff'd, 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622 (1953).

Code, Section 881(a) and (a)(7), is a monetary punishment and, as such, is subject to the Excessive Fine Clause of the Eighth Amendment to the United States Constitution. 509 U.S. at 602, 113 S.Ct. 2801. Congress intended civil forfeiture under § 881(a) to serve both as a deterrence and as punishment. *Id.* at 621 n. 14, 113 S.Ct. 2801. In *United States v. 829 Calle de Madero,* 100 F.3d 734 (10th Cir.1996), the Tenth Circuit stated in reference to *Austin:* "We believe that *Austin* retreats from, at least for excessive fines consideration, the legal fiction that it is solely the guilt of the property—as opposed to the conduct of the owner of claimant—that is being punished." *Id.* at 736. Relying on *Austin,* the Tenth Circuit acknowledged that civil forfeiture is punishment, and that Congress intended by enactment of the civil forfeiture proceedings to punish individuals involved in *drug trafficking. Id.* at 982.

In determining whether the Excessive Fines Clause has been violated, the Tenth Circuit directs us to consider the connection between the property and the offense charged and whether the forfeiture is grossly disproportionate to the crime in light of the totality of the circumstances. "That is, '[t]he language of the [E]ighth [A]mendment demands that a constitutionality cognizable disproportionately reach such a level of excessiveness that in justice the punishment is more criminal than the crime.'" 100 F.3d at 738, citing *United States v. Sarbello,* 985 F.2d 716, 724 (3rd Cir.1993). Because civil forfeiture must be supported by a corresponding *criminal* offense which involves something more than simple possession of a controlled substance, the Court finds that the MCN's forfeiture of Miner's new 2004 Hummer 2 (valued at $55,000), cash (of $1,463.14) and a day planner based solely on a *civil* traffic citation for Disorderly Conduct (assessed at $ 334) violates the Excessive Fine Clause of the Eighth Amendment. Ac-

cordingly, the tribal court was without jurisdiction to seize and forfeit Miner's property. The Court finds that the tribal court acted outside its jurisdictional authority in imposition against a non-Indian of a tribal ordinance which is in direct violation of the United States Constitution. The Court further finds that a tribal court's jurisdiction over a non-Indian must be in compliance with and subject to the protections afforded by the United States Constitution, Bill of Rights and Excessive Fine Clause. As stated by the Supreme Court in *Oliphant:*

> Protection of territory within its external political boundaries is, of course, as central to the sovereign interests of the United States as it is to any other sovereign nation. But from the formation of the Union and the adoption of the Bill of Rights, the United States has manifested an equally great solitude that its citizens be protected by the United States from unwarranted intrusions on their personal liberty. The power of the United States to try and criminally punish is an important manifestation of the power to restrict personal liberty. By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress.

435 U.S. at 209–10, 98 S.Ct. 1011.

In reference to its traffic and safety code, the MCN points out that its authority to issue civil forfeiture is more extensive than authorized under federal law or under Oklahoma statutory law, in that, the MCN code specifically authorizes civil forfeiture for simple possession of a controlled substance. The Court finds that because the tribal court's interpretation of its own tribal code violates the Excessive Fines Clause of the United States Constitution, the tribal court's ef-

forts to impose its unconstitutional statutory scheme against a non-Indian exceeds its jurisdictional authority to do so. As previously stated, a tribal court's authority over non-Indians on Indian land cannot violate the non-Indian's rights and protections under the Federal Constitution.

### Exclude, Evict and Deliver Up—Tribal Recourse

█ The MCN argues that absent the authority to issue civil forfeiture against the property of non-Indians who engage in illegal drug activity on Indian land, the MCN is without recourse to minimize the negative impact on its economic security, and on the safety of all patrons who visit tribal businesses. The Court finds no merit in this argument. In *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), the Supreme Court reiterated that tribes "clearly can exclude or expel those who violate Tribal ordinances." *Id.* at 342, 103 S.Ct. 2378 n. 27. As enforcement powers, clearly tribes retain the power to evict non-Indians, but not prosecute them. "A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is equally well established." *Id.* at 333, 103 S.Ct. 2378, citing *Montana* and *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21

(1982). Further under some circumstances a State may exercise concurrent jurisdiction over non-Indians acting on tribal reservations if such activity is not preempted by federal law. *Id.*, citing *Washington v. Confederated Tribes*, 447 U.S. 134, 153, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (Tribes are divested of the power to prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights).

MCN also argues that it has no other recourse because it lacks "cooperation with the state and no federal prosecution is available for these types of offenses." The Court finds no merit in this argument. Federal criminal law is applicable to Indian lands. Title 18 United States Code, Section 1152 provides that the general laws of the United States as to punishment for offenses committed in any place within the sole and exclusive jurisdiction of the United States shall extend to the Indian Country. Federal courts have jurisdiction to criminally prosecute non-Indians who engage in illegal drug trafficking on Indian land, including in the appropriate case, to issue civil forfeiture. Thus, the duty of the Tribe is to detain and promptly deliver up any non-Indian offender who violates federal narcotic laws, rather than pursue "civil prosecution" and forfeiture. See e.g. *Oliphant*, 435 U.S. at 207, 98 S.Ct. 1011.[6]

6. In *United States v. Green*, 140 Fed.Appx. 798 (10th Cir.2005), a non-Indian defendant pleaded guilty in federal court to possession of a firearm and ammunition after former conviction. The Tenth Circuit found that tribal law enforcement personnel had reasonable suspicion to investigate the defendant's vehicle which was parked in the MCN casino parking lot as a possible stolen vehicle. A tribal officer, who was cross-deputized by the Bureau of Indian Affairs, was called to the scene. The Tenth Circuit determined that the BIA tribal officer had probable cause to conclude that a gun which was seen in plain view inside the non-Indian's vehicle was evidence of a crime. The vehicle was then impounded and inventoried. In response to the non-Indian's challenge that the tribe had no authority over him, the Tenth Circuit stated that Tribal officers do have the authority to investigate violations of law on tribal land and detain persons, including non-Indians. "Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.* at 800, citing *Duro v. Reina*, 495 U.S. 676, 696–97, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

The enforcement of federal criminal statutes (as opposed to state, tribal or local criminal statutes) on tribal land has traditionally been the responsibility of the Department of Interior's Bureau of Indian Affairs (BIA). *Hopland Band of Pomo Indians v. Norton* 324 F.Supp.2d 1067 (N.D.Cal.2004). Through passage of the Indian Law Enforcement Reform Act of 1990, 25 United States Code, Section 2802(a), the BIA is responsible for providing, or for assisting in the provision of, law enforcement services in Indian country, which includes among other services, (1) the enforcement of Federal law and, with the consent of the Indian tribe, tribal law; (2) the investigation of offenses against criminal laws of the United States, in cooperation with appropriate Federal and tribal law enforcement agencies; and (3) the protection of life and property. 28 U.S.C. § 2802(c)(1)(3). Accordingly, the Court finds that the MCN is not without recourse to curtail illegal drug trafficking on Indian land.

## Conclusion

In its brief, the MCN admits that *Oliphant* would apply if Miner's conduct was criminal in nature. The MCN also admits that if an Indian had committed the very same offense as Miner on Indian land, the Indian would be charged with a felony. The MCN relies on federal law to assert civil jurisdiction over Miner. However, it is federal law which limits tribal courts when tribal codes violate federal law and the United States Constitution in its application to non-Indians. The MCN civil forfeiture provision is prohibited by *Oliphant* because the tribal civil forfeiture provision is quasi-criminal and therefore punitive in character. MCN is attempting to disguise a law as civil when it should be characterized as criminal because an Indian who commits the same infraction would be tried criminally as a felon and his property subject to civil forfeiture. Through passage of 18 U.S.C. § 1152 and 25 U.S.C. § 2802(a),

Congress has preempted tribal court's power to regulate non-Indians illegal drug trafficking on Indian land. In so doing, Congress has provided Tribes a recourse to protect their people, patrons, property, and business enterprises from the ills of drug trafficking. Accordingly the Court finds and concludes that the motion for summary judgment filed by the plaintiffs Russell Miner and Miner Electric, Inc. [Dkt.# 31] should be and hereby is GRANTED. The injunction shall issue forthwith.

IT IS THEREFORE THE ORDER OF THE COURT that the motion for summary judgment brought by the plaintiffs Russell Miner and Miner Electric, Inc. is hereby GRANTED.

IT IS FURTHER ORDERED that the plaintiffs shall submit within twenty days of the date of this order, a proposed order setting forth the relief requested by plaintiffs in their Amended Complaint filed herein on December 1, 2005, which is consistent with the provisions of this order executed on this date.

IT IS FURTHER ORDERED, that the plaintiffs are granted leave of twenty (20) days from the date of this order to submit a brief in support of their request for attorney fees, setting forth the legal authority supporting their request and the amount of reasonable fees requested. The defendant is granted twenty (20) days thereafter to file a brief in response.

IT IS SO ORDERED.